

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00285-CV

_____

IN THE INTEREST OF C.E., A CHILD

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. P2021009

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

The jury heard evidence that infant C.E. (Carlo)[1] was injured by intentional trauma. The jury found that both his mother, B.K (Mother) and his father, C.E. (Father), had endangered the child, that terminating Mother's parental rights was in Carlo's best interest, and that terminating Father's rights was not. In accordance with those and other jury findings, the trial court terminated Mother's parental rights based on the termination grounds in Texas Family Code Section 161.001(b)(1)(D), (E), (O) and (b)(2) and Section 161.003. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1),(2), 161.003.

In two issues, Mother (1) challenges the legal and factual sufficiency to support the jury's findings and (2) argues that under Section 161.003, the trial court held the trial prematurely. We will reverse. First, the evidence does not support the predicate termination ground in Section 161.001(b)(1)(O). Second, the evidence does not support a finding that Mother's mental health conditions rendered her unable to care for Carlo and thus does not support termination based on Section 161.003. Finally, the evidence does not support a finding that Mother injured or that she otherwise endangered Carlo and thus does not establish the termination grounds in Section 161.001(b)(1)(D) and (E).

---

[1]We use an alias to identify the child and persons through whom the child could be identified, and we identify family members by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## Background

## I. Department's Case Opening, Order of Investigation, and Procedural History

The Department of Family and Protective Services opened its child-protective-services case regarding Carlo after Mother took him to Cook Children's Medical Center in Fort Worth on February 25, 2021. According to Donna Wright, a pediatric nurse practitioner with Cook Children's CARE team, Carlo was admitted to the hospital due to a subdural hematoma on both sides of his brain, a post-traumatic seizure, retinal hemorrhages in his eye, "and [a] closed fracture of parietal bone of the skull with subdural hemorrhage." The CARE team determined that the injuries were caused by an intentional act, and the hospital therefore notified the Department and local law enforcement about Carlo's injuries.

Both the Department and the Hood County Sheriff's Office responded. Investigators from each agency interviewed Mother and Father[2] over the next week and half:

*Evening of Thursday, February 25–Morning of Friday, February 26*

- Guy Reynolds, an investigator with the Hood County Sheriff's Office, interviewed Mother at the hospital in the late evening of February 25. Reynolds recorded his conversation with Mother, and part of that recording was played

---

[2]The Department investigators interviewed the parents in connection with this child-protection case. Hood County Sheriff's Office investigators interviewed them in connection with a criminal investigation for child abuse.

for the jury.[3] Father was not interviewed then; Reynolds went home after he finished the interview because he was too tired to interview Father.

- Mother, however, had another interview after speaking to Reynolds. At around 1:30 a.m., she was interviewed by Brandi Dees, a special investigator with the Department.

- Father woke up around 3 a.m. and deleted from his phone some pornographic photographs that a friend had sent him in a WhatsApp group chat.

*Friday, February 26*

- Holly Mizer, a Department investigator who became the primary investigator on the case, had a phone call with Mother and a brief phone call with Father.

- Nurse Practitioner Wright saw Carlo, and she spoke to Mother to get Carlo's history. Mother seemed "extremely distressed" and "overwhelmed by the medical condition of [Carlo]."

*Saturday, February 27*

- Investigator Reynolds and Hood County Investigator George Zamarron met with Father at his home for about thirty minutes. Unlike Reynolds's interview with Mother, he did not record this interview. Reynolds took cell phones from Mother, Father, and Mother's father (Grandfather), and extracted the phones' data.

*Monday, March 1*

- Mizer and Zamarron interviewed Mother. In that interview, Mother told Zamarron that Father had placed cameras inside the home earlier that month. Mother also told Zamarron that Father was emotionally abusive and controlling. Mizer noted that Mother did not show emotion during the interview.

---

[3]The recording is two hours long. The attorneys at trial did not specify what part of the recording was played during trial.

- Around this date, the Department's special investigator Dees interviewed Father, with his attorney present; at trial, she could not remember the exact date of the interview.

*Wednesday, March 3*

- Mother met with Mizer again, and the Department acted to remove Carlo from his parents' care.

*Thursday, March 4*

- Department investigator Mizer interviewed Father with Father's attorney present.

*Friday, March 5*

- Zamarron formally interviewed Father with Father's attorney present. Zamarron recorded this interview. Zamarron played the recording of this interview for the Department's attorney at some point before trial, but Mother's attorneys did not learn of the recording's existence until Zamarron testified.

The Department filed its petition for protection of a child, for conservatorship, and for termination of both parents' parental rights, and the trial court signed an order authorizing Carlo's removal from his parents. Mother and Father each filed a cross-claim for termination of the other parent's parental rights. The attorney ad litem appointed to represent Carlo filed a counterpetition to terminate Mother's parental rights.[4] At trial, the Department dropped the termination ground that it had alleged against Father.

---

[4]The Department, Father, and Carlo's attorney ad litem were aligned at trial, so when discussing them collectively, we refer to them as the Department Parties.

The case was tried to a jury, which heard eight days of testimony. After hearing testimony from Nurse Practitioner Wright, Mother, Father, Grandfather, law enforcement officers, mental health care providers, caseworkers, and the parents' acquaintances, the jury found that Mother

- had engaged in conduct, or had knowingly placed Carlo with persons who had engaged in conduct, that endangered Carlo's physical or emotional well-being, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(E);

- had knowingly placed Carlo in—or had knowingly allowed him to remain in—conditions or surroundings that had endangered his physical or emotional well-being, *see id.* § 161.001(b)(1)(D);

- had a mental or emotional illness or a mental deficiency that rendered her unable to provide for Carlo's physical, emotional, and mental needs, and the illness or deficiency, in all reasonable probability, would continue to render her unable to provide for Carlo's needs until his eighteenth birthday, *see id.* § 161.003; and

- had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain Carlo's return, *see id.* § 161.001(b)(1)(O).

The jury found that Father had engaged in conduct that had endangered Carlo's physical or emotional well-being or had knowingly placed Carlo with persons who had engaged in endangering conduct. Finally, the jury found that the termination of Mother's parental rights was in Carlo's best interest but that termination of Father's parental rights was not. The trial court accordingly found the predicate termination grounds in Texas Family Code Section 161.001(b)(1)(D), (E), (O), and Section 161.003 existed with respect to Mother and that termination of her parental rights was in Carlo's best interest. Accordingly, the trial court terminated Mother's parental rights

6

and appointed Father as Carlo's sole managing conservator. Mother filed motions for judgment notwithstanding the verdict and for new trial, which the trial court denied.

## II. Facts Preceding the Investigation

The relevant facts of this case began with Mother and Father's relationship, so we summarize the history of their relationship through February 24–25, 2021, when Carlo's injuries manifested. Then, because the parties at trial focused on the parents' actions on February 24–25, we summarize what each parent told the investigators and the jury about the events of those two dates.

### A. 2007 and 2016–2018

Mother and Father met in 2007 in veterinary school and had an on-again, off-again romantic relationship. They lost touch for a few years and reconnected in 2017 while Father was living in New Jersey and Mother was living in Houston. Father came to Texas periodically, however, to teach classes at a veterinary academy in Arlington operated by Mishell Copley, who became Father's friend. Coincidentally, Copley knew Mother's mother (Grandmother) and considered her a friend. Mother's parents lived in Arlington, and Mother sometimes came to stay with them.

In October 2017, before Mother reconnected with Father, she voluntarily admitted herself to a hospital in Houston for psychiatric care. The impetus of the hospitalization was a video that Mother had posted on Facebook. In that short video, Mother, in obvious distress, appeared to believe that the world was ending, and she encouraged people to gather with their loved ones; as noted by a psychologist who

evaluated Mother as part of this proceeding, Mother looked scared in the video but not angry or violent. Mother told the jury that prior to the day that she recorded the video, she had been having vivid dreams that the world was ending, and that day she woke up believing the dream was true.

Before Mother had this breakdown, she suffered a number of stressful, traumatic experiences. In 2016, her then-boyfriend attacked her and attempted to kill her. In 2017, her mother was diagnosed with cancer, and her dog died of cancer. That same year, Mother was working for the veterinary clinic of Dr. Vera Domnall when Domnall was arrested for attempting to hire someone to kill her ex-husband. Domnall then died by suicide. Those two events first left Mother working twelve-hour days as the only remaining full-time veterinarian on staff at the clinic and ultimately left her unemployed.

A physician who examined Mother in connection with her 2017 hospital admission, Dr. Jamal Rafique, diagnosed her with "bipolar disorder manic with psychosis." Mother believed that the doctor had misdiagnosed her, and a few days after her admission, she requested to be released. Someone (presumably affiliated with the hospital) filed in a Houston trial court an application for temporary mental health services. The application was accompanied by Dr. Rafique's certificate of medical examination in which he checked options on the form certificate stating that Mother was likely to cause serious harm to herself and to others. He handwrote on the form

that Mother was psychotic, delusional, unable to sleep, had poor concentration, and was unable to protect herself.

The trial court ordered that Mother be put into protective custody, that she be examined by Dr. Rafique, and that a hearing be held to determine whether probable cause existed for Mother's immediate restraint. After the hearing, the court determined that probable cause did not exist to believe that Mother presented a substantial risk of harm to herself or others, and she was released against medical advice pending a final hearing. After the final hearing, the court dismissed the case.

Mother told Father about the 2017 hospitalization and said it was because of stress. She disclosed that the doctor had diagnosed her with bipolar disorder, but she told Father that she disagreed with that diagnosis.

In February 2018, Mother again submitted herself to voluntary hospitalization for mental health services—this time for depression and suicidal ideation. According to Mother, she went to the hospital because she "didn't really have a doctor" or a "complete package of care." During her second hospitalization, she was treated by a Dr. Nayeem, a psychiatrist, and she continued to see her for treatment. She also began seeing a therapist. Dr. Nayeem diagnosed her with depression or post-traumatic stress disorder (PTSD); testimony indicated that she may have also diagnosed Mother with

9

bipolar disorder,[5] but Mother's medical records from that hospitalization were not introduced at trial.

Father moved to Granbury, Texas, in 2018 after purchasing a veterinary practice there. Mother continued living and working in Houston.

**B. 2019–2020**

Father and Mother became engaged in 2019. Father initially had a good relationship with Mother's parents, but according to Father, that changed as Grandmother became "more aggressive" toward him. Father claimed that when the couple got engaged, Grandmother refused to look at the ring and was so upset about the wedding that she fell and broke her arm. Mother, on the other hand, said that when Grandmother became upset about the ring, it was because of Father's reaction when Grandmother had asked him when he and Mother were going to get engaged. It was at Mother's birthday party, and Father "pulled the ring out of his bag and then he threw it across the bed at [Grandmother] and was like, I was going to propose this weekend, but you are always in town and you ruin everything." In January 2020, Father joked with a friend about using Grandmother as target practice. In March

---

[5]Mother's current psychiatrist testified at trial about what Mother had told her about her mental health issues in 2017 and 2018, and the doctor said that Mother had reported that "she was diagnosed with bipolar in 2018." Mother testified that it was during her second hospitalization—which was in 2018—that she began seeing Dr. Nayeem.

2020, Father texted a friend about visiting Grandmother and said that "god willing [I] could hand[-]deliver coronavirus to that bitch."

The couple originally planned to marry in September 2020, but the outbreak of COVID-19 delayed their plans. The delay became a source of friction in the relationship. Father wanted to not have the wedding in the middle of the pandemic, but Mother wanted to get married before Grandmother died.[6] Father claimed that he would have been fine with a small courthouse wedding. Mother, however, did not like that plan because she had already paid $10,000–15,000 in deposits for the wedding. Father began having second thoughts about getting married. Father said that it was around that time that his relationship with Grandfather began to sour.

In June 2020, Mother met with licensed professional counselor (LPC) Susan Boles for a counseling session over the phone. According to Boles, Mother reported concerns that her parents were trying to break up her relationship with Father and that her parents had stolen one of her credit cards. Although Boles is not a licensed marriage and family counselor, she also met with Mother and Father together for several counseling sessions—once by Zoom and twice in the office.

When Mother told Father that she was pregnant, he was surprised, and he testified that he could see how Mother might have perceived his reaction as "less than supportive." Mother said that when she told Father, he seemed shocked and angry

---

[6] In April 2020, Grandmother had been given only a few months to live.

and told her not to tell anyone. In his testimony, Father agreed that it took him a few days to be happy about it. Father testified that he had wanted to keep the news to themselves because of a higher risk of miscarriage due to Mother's age. He also asked Mother to get an amniocentesis because , according to Mother, he "did not believe in bringing a disadvantaged child into the world."

After they told their families about the pregnancy in late September 2020, Mother thought Father was fine with her telling everyone else, but he still wanted to take more time before telling friends and coworkers. According to Mother, when they had a baby shower, Father told his friends not to attend.

In addition to being a veterinarian, Father is also a doctor of pharmacy, and before Mother became pregnant, Father had told her that if they were to have children, some psychiatric medications could not be taken during pregnancy. Mother testified that after she became pregnant, Father did not want her to take Celexa, an antidepressant. Because he was a pharmacist, she trusted his opinion. Her therapist in Houston knew that she was going to stop taking the Celexa and was fine with that decision. Father testified that Mother told him that she had quit one of her antipsychotic medications but denied that she had told him which one. Mother testified that she never stopped taking another prescribed medication, Seroquel,[7] but there was some evidence at trial that she did stop that medication.

---

[7]Seroquel is prescribed for bipolar disorder, for depression, and for sleep problems.

In October 2020, Father bought a house from Krissy Burke and her husband, and Krissy testified about the time she had spent around Mother and Father from the time that they moved in until after Carlo's birth. Mother moved in with Father after he bought the house, and Krissy and her husband went to the house every week for multiple weeks to help Mother learn how to use the lawn mower, pool equipment, and other issues in the house. Mother referred to Father as her fiancé, but he referred to Mother as his girlfriend. The Burkes found out two weeks before Carlo's birth that Mother was pregnant, and Mother told them that Father did not want her to tell people. Krissy said that they went to the house so often to help Mother because they "had concerns," and she felt that there was "something off" about the couple's relationship and "just something said [Mother] needed help." Thus, because they felt that something was wrong with the relationship, they decided, "we're just going to do this. We're going to take the time. If she asked us to come over, we're going to help. I fe[lt] like there's something wrong."

Father's relationship with Grandfather continued to be contentious. In December 2020, he texted a friend, "Truly that's going to be when it goes really bad, when the baby is born. They both think I'm going to allow [Grandfather] to be around." Father also "joked" with a friend about killing Grandfather and putting his body in the clinic's deep freezer.

13

**C. January 2021**

Carlo was born on January 2, 2021. Father did not take off from work while Mother was in labor because of the costs of hiring a relief veterinarian, but he did spend one night in the hospital with them. Father took no time off from work after Carlo's birth. He worked full days Monday through Friday, usually leaving the house around 7:00 a.m. and returning home around 6:00–7:00 p.m., and he also worked some on Saturdays and Sundays. That left Mother "carrying most of the load" in caring for Carlo. Mother testified that Father had offered to hire a nanny to help but he told her that payment for the nanny would have to come out of her salary, so Mother declined.

LPC Boles had a final session with Mother in January 2021 for a mediation with Mother, Father, and Grandfather about how to navigate Father's and Grandfather's contentious relationship. The reason for the mediation was that Father did not want Grandfather alone with Mother in the house with Carlo. The mediation session was precipitated by Father's threatening "to have it out with [Grandfather] on the lawn." At trial, Father did not deny that it was not just Grandfather's presence at the house that he wanted to ban—before Carlo's birth, Father had said that he did not want Grandfather around Mother or the baby at all. At the mediation, unlike in the previous sessions with Boles, Mother did not seem to have any concerns about Grandfather. According to Boles, the three agreed that Father would be at the house if Grandfather were there with Mother and Carlo.

## D. February 1–February 23, 2021

On February 6, 2021, Mother told Father that she wanted a separation, and she took Carlo with her to the house of her friend Ilene Thomas and Thomas's husband. Mother explained that she left because the week before, on January 28—the day after their mediation with Boles—Father had asked her to leave because he was angry that she had let Grandfather come over. According to Mother, Father kicked Grandfather out of the house and told Mother, "You and I have nothing. Get out of my house." She defused the immediate situation, but her anxiety began building about the state of their relationship. Furthermore, Father had told her that she could not work at his clinic anymore—which would require her to get a job thirty to forty-five minutes away—but that she would also have to pick up Carlo from daycare, which was something that would be logistically impossible if she were working elsewhere. Mother said that the day she left, Father had come home in the early afternoon, and when she tried to talk to him about her feelings and about what had happened the week before, he just told her that she did not look well and should take a nap. She suddenly "got a little fearful," so she told him that she was going to the Thomases, packed some things, and left. Father stated that Mother had left because she wanted Grandfather to be able to come to the house when he was not there.

During the twenty-four hours after Mother left, Father texted Mishell Copley about Mother: "F[--]k that bitch"; that Mother was "out. No coming back"; that he was "done"; and that once a person had lost his trust, it could not be regained. Father

15

said at trial that his reference to losing trust in Mother was because he had found out that when Mother was pregnant, she told her family about her pregnancy but did not tell him that she had done so, and she and her family had let him believe that they did not know. Mother told the jury that she had told Grandmother about the pregnancy when Grandmother was days away from dying.

Mother said that she told Father how much anxiety she was having around this time, but she conceded that she did not use the word "crisis" to describe her mental state. Father denied that she had told him about her anxiety. Texts from Father showed, however, that at least by February 8, he unquestionably knew that she was having an issue with her mental health, which he planned to use to get custody. On February 8, he texted a friend that he was in the office of a family law attorney and that Mother had "[l]ost her mind. Literally, [I] think she's in crisis. I'm going to ask the court to order her to [a] mental hospital for an evaluation and to get her some psychiatric help." The next day, in texts to friends referring to Mother as "this bitch," he told the friends that Mother had told him that she wanted to move back in. He then texted that if he kept "meeting her irrational thoughts/demands with reasonable que[s]tions and requests that prevent her from whatever her plan is. . . . . . she'll be in a crisis mentally soon"; that he could "see her cycling through thoughts [and] becoming flighty" and that he was "documenting the swings in t[h]oughts and rapid cycling between them. . . she is going into crisis." He also texted, "I am really starting to believe and feel in control," and "I'm letting her take all the rope she wants, she

16

will hang[ ]herself and end up in a psyc[h] ward long enough to give me a chance for custody." That same day, he texted Mother that he loved her.

Father testified that he and Mother continued to communicate while she was with the Thomases but that when he had tried to schedule time to visit Carlo, she canceled and blamed the Thomases, saying that they would not allow her to go see him. Ilene Thomas agreed that such a statement was not strictly true because she and her husband could not physically prevent Mother from leaving, but she believed that Mother said that she was not "allowed" to go see Father because she knew that the Thomases did not want her to go home and because Mother was afraid to go.

Father testified that Mother had called on February 9 to say that she wanted to come back, and he told the jury that he was not for or against it but wanted to talk more before they decided. However, other texts from Father showed that he had already spoken to an employment attorney about how to end Mother's employment at the clinic and to a family-law attorney about how to gain custody of Carlo.

On February 10, Mother told Father that she would bring Carlo over that day and asked if 2:30 p.m. would work. When he confirmed (saying "[c]an't wait to see you two"), she asked if she could leave Carlo with him so that she could go to a doctor's appointment, and he agreed. Father said that when she showed up at his house, "[s]he could barely talk. Her voice was shaking. She was shaking so bad that I had to grab the baby from her." She told him that Grandfather was taking her to an emergency room and that she would probably be hospitalized, and she asked if she

could come back to the house that night if not hospitalized. He told the jury that he responded, "absolutely, I'll help you through this." Interestingly, that night he sent Mishell a text stating, "The lawyer said it would look better if I let her in while in crisis than to turn her away. The courts will see that I'm doing what's best regardless of what she has done" and that he "need[ed] to show [he's] working with the situation."

Mother testified that she simply wanted to get a doctor's assessment when she went to the ER that day, and she disagreed with Father's description of her demeanor when she had dropped off Carlo with him. Mother was asked about the fact that on February 10, Grandfather texted a family member that Mother was going in crisis and that she had said that she felt like she did "3 years ago," but she denied that he was referring to the episode that led to her previous hospitalizations. The ER doctor did not see a need to hospitalize Mother; she was given a dose of Ativan for anxiety and a prescription for future use, and she returned to Father's house that night. Father was apparently not too concerned with Mother's condition because he went to work the next day, leaving her alone with Carlo.

Around that time, Mother made a February 24 appointment with psychiatrist Dr. Diana Ghelber, who had an office in Granbury. Mother wanted to transfer her care from her Houston doctors because she felt like she was "going into crisis."

At that time, Mother did not know that Father was planning the end of their relationship. On February 14, the two exchanged gifts and cards and "said [they] loved each other." On February 17, Father texted a friend that Mother was "acting as

18

if nothing [had] occurred. . . . WTF is wrong with her" and that "[i]t may be her psyc condition. . . . not sure. It may also be as simple as she's a c[—]t and just wanted to get her way to have her father over [to] the house."

In early February, Krissy saw Father at his veterinary clinic,[8] and as a result, became concerned about Mother. When Krissy was there, she spoke to Father outside the clinic from her car, and she asked him how he liked the community. He said that he "f[--]king hated it. He hated the people. He hated being there." She asked him about parenting, and he said that he was tired; that he "had [Mother] on a . . . schedule"; and that Mother was happier when he "allowed" her to do certain activities, like going on a walk or do surgery at the clinic. Alarmingly to Krissy, Father said that he felt like Mother was going to hurt Carlo, so Krissy offered to help. "At that point[,] his demeanor completely changed entirely." Father told Krissy that he had put Mother "on a very strict eight-week lockdown for COVID because he was very nervous about it, which [Krissy] found odd because he was in [her car] window without a mask." Krissy said it "blew [her] mind" that he would say that he was afraid that Mother would hurt the baby and then not allow her to go to the house to help, even though she had already been to the house multiple times. After that, she was not

_____

[8]She was at the clinic to have her dog seen by Father as a trade for utility bills that Krissy and her husband had paid on the house that Father had purchased. Father had not transferred some of the utility bills into his name right away, and because Mother was pregnant, the Burkes paid the bills rather than having the utilities cut off. Father agreed that the Burkes could bring their dog up to Father's clinic as reimbursement for those bills.

allowed to go by the house; any of the Burkes' mail that was misdelivered to Father's house had to be retrieved from Father's clinic.

Around this time, Mother had increasing anxiety. She texted Grandfather multiple times between February 10 and February 22 telling him about her anxiety. On February 18, she texted him that Father was "[a]lways angry about the staff or work or the clinic or the day[,] and [her] anxiety when listening to that just buil[t]." On February 22, she texted him, "Panic attacks last night about [she and Father] not being together raising the baby." The next morning she texted Grandfather that she had endured "a few yucky anxiety[-]filled bouts last night" but that she had taken her medications and felt "a little better." On February 24, before her appointment with Dr. Ghelber, she texted Grandfather that she "had major anxiety [that] morning more than before but took deep breaths and fe[ll] back asleep."

However, Grandfather was not worried about Mother's mental health because despite her texts mentioning anxiety, her texts sounded fine after she took her medication every day. Grandfather had never seen Mother's anxiety manifest into anger or any kind of violence. Instead, her anxiety made her unable to sleep. Texts from Mother to Grandfather around this period indicated that she was taking her prescribed Seroquel; she was taking half at 8:00 p.m. to help her sleep and then the other half at 4:00 a.m., when she got up to feed Carlo, so that she could sleep again after that rather than "sit[ting] there with anxiety until 7:00 a.m."

**E. February 24–morning of February 25**

On the morning of February 24, Mother had her previously-scheduled appointment with Dr. Ghelber, who testified as an expert at trial. Mother had taken Carlo with her to her appointment, and Grandfather met her there and stayed in Mother's car with Carlo during the appointment. He did not think that Mother looked like she was in a crisis on the morning of February 24, and he saw nothing in her that morning that gave him cause for concern.

Dr. Ghelber similarly did not find Mother to be erratic or someone who posed an immediate danger to herself or who needed to be hospitalized. She described Mother as seeming dysphoric, that is, "the opposite of happy." She further stated that she disagreed with Mother's prior diagnosis of bipolar disorder. Her opinion was that Mother had PTSD; generalized anxiety disorder; panic disorder; and major depressive disorder, moderate. Dr. Ghelber stated that when a person is in an acute phase of severe PTSD, that person's symptoms "can be very extreme and sometimes can be perceived as psychotic." She explained that "one of the cardinal symptoms in PTSD is nightmares," that "nightmares reflect usually the trauma" of the patient, and that the nightmares "are so intense and so disturbing that sometimes the person can get up and not know[ ] if it is reality or if—they feel that this is their own reality until they wake up completely." Dr. Ghelber reported that Mother's depression had reached remission, that Mother had been doing very well since she had begun seeing her, and

that Mother talked about Carlo with appropriate emotion. Mother did not exhibit any symptoms of PTSD at the time of trial.

After that appointment, Mother and Grandfather went to the post office, where Grandfather again waited in the car with Carlo while Mother went inside. Carlo was "[h]appy and playful." They then went to the park for a while before going to the grocery store. Carlo was still happy and playful. At the grocery store, Grandfather once again stayed in the car with Carlo while Mother went inside. He fed Carlo while waiting; Carlo "ate like a horse." Grandfather did not notice any injuries on Carlo or anything that would indicate that something was wrong with him. After the grocery store, Mother then went home.

When they were at the park, Mother received an email from Father with a copy of a cohabitation agreement. While Mother was staying with the Thomases, Father had raised the issue of signing a cohabitation agreement, but Mother did not know what that kind of agreement was like, so Father sent the sample agreement to show her. At some point during the day, Mishell texted Father to say that Mother had asked to work at his clinic, and he responded that "[s]he can f[--]k herself."

The parties disagreed about what happened that evening after Father came home from work, and we set out below what each told investigators and the jury. First, the jury heard slightly different testimony about what time Father came home:

- <u>Father's statements</u>. Father told Dees that he had arrived home around 7:15 p.m. and told the jury that he had come home around 7:00 p.m.

- <u>Mother's statements</u>. Mother told Nurse Practitioner Wright that on February 24, she had come home around 4:30 p.m. and that Father had come home around the same time. She told the jury that Father had come home around 7:00 pm.

Mother and Father told investigators and the jury different things about what had happened when Father came home:

- <u>Father's statements</u>. Father told Dees that when he arrived home, Mother was sitting in a chair, and Carlo was screaming. He told the jury that Carlo "was more fussy [than usual]. He was louder," and he would not settle down. Father denied that Carlo was typically fussy at night, but he acknowledged that the night before, Carlo had cried for two hours. Mother was visibly upset and asked Father to get a bottle for Carlo. When Father asked Mother where the clean bottles were, Mother screamed at him to "just get the F'ing bottles." She then tried to feed Carlo, but he did not eat much.

- After Father ate dinner, he took Carlo to try and soothe him. He eventually settled down, and then Father tried to talk to Mother. They talked for about an hour, but she "became just kind of absent" and "kind of looked through [him]." At one point, she stared off and said, "I just want to go to the Swiss Alps and be pulled in a sled by horses in the snow." On cross-examination, he stated that he had finally made it clear to Mother that evening that he did not want to marry her.

- <u>Mother's statements</u>. Mother told Nurse Practitioner Wright that when she fed Carlo around 7:00 p.m., he was a little fussy. Mother's feeding log[9] noted that she had fed him at 6:30. Mother told Reynolds that Carlo had begun getting fussy around 6:30 or 7:00 p.m.

- Regarding Father's assertion that she had said something about skiing in the Alps, Mother noted February 24 was just after the severe winter storm that year, but she did not remember making any statement about wanting to be in the Alps. She disputed to the jury that she and Father had any disagreement about the bottles or that she was angry. Instead, it was Father who was angry, and the disagreement was about the cohabitation agreement. Mother was not

---

[9]Since Carlo's birth, Mother had kept a log of Carlo's feeding times and what he ate at each feeding.

happy about the cohabitation agreement example that Father had sent her because it included a medical power of attorney and because the type of agreement that he had sent her was one for when a relationship was ending. When Father arrived home that day, she told him that she would not sign the cohabitation agreement, and Father got "very irritated." He raised his voice and told her, "[N]o, you're going to sign that. It's non-negotiable."

Mother and Father both said that Father had taken care of Carlo for a few hours in the evening, but they disagreed about whether she had gone to bed then:

- Mother's statements. Mother told Dees that she began feeding Carlo around 8:00 p.m. because he was fussy, and she gave him to Father to finish feeding him. She told Reynolds and the jury that Carlo was fussy while Father was caring for him around 8 or 8:30 p.m., but Father told her that Carlo was fine and to go to bed.

- Father's statements. Dees, Mizer, Reynolds, and Zamarron did not testify about what Father said, if anything, about caring for Carlo around that time or if he was fussy. Father told the jury that while he was holding Carlo, he noticed that the baby started screaming whenever he was moved.[10] Mother went to take her bath but was not in the bathroom for long, and when she came out, she kept "hovering over" Father and fussy Carlo.

Mother said that she got out of bed around 10:00 p.m. when she heard Carlo make an unusual scream, and Father told the jury that there was no unusual scream:

- Mother's statements. Mother told the jury that after Father took over caring for Carlo, she took a bath, took her Seroquel, and went to sleep, but she woke up around 10 or 10:30 p.m. when she heard Carlo make a scream he had never made before. To Wright, Dees, and Mizer, she described the scream as 'bloodcurdling," although she told the jury that she used the adjective "bloodcurdling" only after Dees suggested that term when Mother was trying to describe the sound. When Mother took Carlo to the pediatrician the next

---

[10]Father also told the jury that "this startle response was going on," like when "we're falling asleep, you kind of jump." However, Dr. Watts testified that what Father described was something that babies do "from the day they're born" and is not a symptom of injury.

24

day, however, she did not tell the pediatrician, Dr. Shannon Watts, about a scream. Mother told the jury that she did not mention a scream to Dr. Watts because she had no idea that Carlo had been injured in that way, i.e., she did not think it was relevant.

- Mother told the jury that when she checked on Carlo after the scream, Father was on the couch holding him, and he said that she did not have to get up every time Carlo cried and that Carlo was "manipulating" them. Father told her to go back to bed, so she did, and Carlo seemed to settle down.

- Father's statements. Father disputed Mother's statement that she went to bed around 8:00 p.m. and said that Mother finally went to bed around 10:00 p.m. Father told Dees that Carlo was crying around that time, but he told the jury that Carlo did not make a "bloodcurdling" scream. Carlo finally fell asleep, and Father put him in his swing about 11:30 p.m. Father fell asleep on the couch. Mizer said that Father mentioned Mother's getting up at some point but did not volunteer any information about Carlo's making an unusual scream. None of the investigators testified to asking Father about a scream.

Both parents agreed that Mother had gotten up at some point to feed Carlo and had let Father sleep, that she had woken him up again at some point so that she could sleep more, and that she had woken up before Father went to work. However, they disagreed somewhat about the time that these events occurred, and only Mother testified that Carlo had vomited after eating:

- Father's statements. Father told the jury that Mother had woken him up around 2:30 a.m. and had told him to go to bed to sleep. Father slept until around 4:45 a.m., when Mother woke him up. He said that she told him that Carlo had been fussy overnight, and Father suggested that maybe he was colicky; they gave him some gas drops, and Mother went to sleep. That settled Carlo down, and Father put him back in his swing to sleep. Mother got up again around 6:30. She seemed fine, and Father went to work. Father texted Mishell that Carlo had been screaming when he had walked in the door the night before, "screamed non-stop" all night, and was screaming when Father left at 6:45 a.m. However, he told the jury that what he said in the text was not true and that Carlo was not screaming when he left.

25

- <u>Mother's statements</u>. Like Father, Mother told the jury that she had woken up, had gone into the living room, and had woken up Father to tell him to go to bed. In contrast to Father, however, she said that she had woken up around 1 or 1:30 a.m. She told Wright and Dees the same thing. Carlo was in his swing, where he liked to sleep. She told the jury that because Carlo was getting fussy again, she changed his diaper and fed him, but he vomited everything back out. She had also told Wright and Mizer about the vomiting. She changed his clothes and tried to settle him, but he would only settle down while held. She woke Father again around 4:30 a.m. so she could sleep more. After they gave Carlo gas drops, she slept again and woke up around 6:30 or 7:00 a.m. Father left for work by 7:15.

That same morning, Father sent Mishell a text saying that he needed Mother to work that week to show that she had returned from maternity leave and that he had a termination letter ready for her, which he expected would "also throw her into crisis."

Because Father was not around Carlo after he left for work that morning, the evidence of what Mother and Carlo did in the morning and early afternoon on February 25 came primarily from testimony by Mother and Grandfather. Mother texted Grandfather to say that Carlo had been fussy; Carlo was not normally fussy in the mornings. Mother told Wright and the jury that when she fed Carlo at 8:00 a.m., he was fussy; to Wright, she described it as "inconsolable." She gave him Tylenol, and after that, he fell asleep on her chest. At 10:00 a.m., Mother fed Carlo again and then took him for a walk. During the walk, she noticed his leg was twitching, so she called the pediatrician, Dr. Watts, to make an appointment for that afternoon. She was at the pediatrician's office by 2:00 p.m.

Dr. Watts testified that Mother seemed appropriately concerned about Carlo. Mother told Dr. Watts that Carlo had vomited his entire bottle after a 1:00 a.m.

26

feeding. Based on that information and Carlo's leg twitching, Dr. Watts was concerned that Carlo could be having a seizure, so she told Mother to take him to the emergency room for evaluation.

Mother and Father took Carlo to Cook Children's together. According to Mother, when the doctor told them that the CT scan showed fractures, she asked Father if something had happened the night before when he had been caring for Carlo, and Father became "really agitated," his face turned red, and he "just immediately got on his phone and just went away from me." When he walked back to her, he told her that the hospital would call child protective services and take the baby into foster care. Because of COVID-19 protocols, only one parent was allowed to stay at the hospital that night, and they agreed that Mother would stay.

Mother asked Father to bring her psychiatric medications to her at the hospital. He did not do so. Because he was also unresponsive to her requests to let Grandfather pick up her medications and bring them to her, she obtained emergency refill prescriptions from her doctor so that Grandfather could have them filled and bring them to her.

### III. The Investigation

Special investigator Brandi Dees testified about her interviews with the parents. In her interview with Mother, she learned that only Mother, Father, and Grandfather had been alone with Carlo on February 24 and that only Mother and Father had been alone with him on February 25. Mother blamed Father for Carlo's injuries. She told

Dees about hearing Carlo scream around 10 p.m. while Father was caring for him. She also told Dees about Carlo's vomiting in the middle of the night and said that was unusual.

Mother told Dees that Father had placed cameras in the house, but Father told Dees that they were not activated. Dees did not investigate whether that was true, but she told Zamarron about them. Dees testified that in a near fatal or fatal child-abuse case, it is normal for law enforcement to secure a warrant to "review a residence," and she knew of no reason why that did not happen in this case. In Father's interview with Dees several days after Mother's interview, he also told her that he had recently bought some cameras for inside the house but had not yet set them up.

Mizer testified that as an investigator, when the Department receives a report of abuse or neglect, her job is to "determine if that abuse or neglect is occurring or not occurring and . . . if the family needs ongoing services or if we need to intervene." In the beginning of her investigation of this case, she was more concerned about Father than about Mother, but that changed over time as she gathered more information.

In Mother's interview with Mizer, she said that Father had attacked Carlo, but she could not define what she meant by "attack." She also said that she had been held hostage by Father. She gave a timeline of her activities on February 24 but did not mention going to her psychiatrist appointment. Mizer discounted Mother's statement about Carlo's vomiting in the night because "there's no evidence of vomiting that's

28

been presented to the Department," but Mizer acknowledged that Mother had told her about vomiting. Mizer's response was that Father did not disclose that there was any soiled clothing or vomit in the house, that is, because Father did not volunteer any statement about vomiting, she rejected Mother's statement. She admitted that she did not ask Father if Carlo had vomited or if he had seen evidence of it. Mizer further stated that she was concerned that Mother was not taking her psychiatric medications because Father had not brought them to the hospital for Mother. She did not follow up to see if anyone else had brought them to Mother and did not review Mother's pharmacy records.

When Mizer later went to Father's home, she saw the cameras, but she did not inspect them or take any other action regarding them. She left them for law enforcement to deal with because the Department has "nothing to do with warrants, seizures, any of that."

Investigators Reynolds and Zamarron also testified. When Reynolds went with Zamarron to Father's home on February 27, he saw two of the three cameras, and Father told them that the cameras were not operational.

Zamarron testified that he did not collect the cameras at that interview because he was told by Father that they had never been set up. Zamarron collected three D-Link brand cameras the next time he went to the house. Only two of the cameras were out in view; Father said the other camera was broken but retrieved it for Zamarron. The cameras did not have SD cards installed. The cameras had the ability

29

to upload videos to cloud storage, but Zamarron waited until a week before trial to obtain a subpoena for D-Link.[11] The footage from the cameras could also be saved to a user's phone through a mobile phone application. Zamarron did not find any saved videos in the data retrieved from Father's phone, and on the seventh day of trial, he took the stand again and told the jury that D-Link had responded to the subpoena and had reported that it had no cloud-stored recordings from Father's cameras because he had not subscribed to that service. However, Zamarron had also obtained a subpoena for the criminal investigation into Carlo's injuries but had not yet received a response.

The cameras may not have been operational when Carlo was injured, but they had been activated by the time that Zamarron met with Father. Father's friend Michael Soltero, who testified that he had flown to Texas on February 26 to be with Father, told the jury that when he arrived, he set up all three of Father's cameras, and Father's phone was receiving notifications from the cameras. He did not install SD cards in the cameras.

Zamarron also testified about information recovered from Mother's, Father's, and Grandfather's cell phones. That information showed that Mother had at some point deleted some texts that she had sent to Grandfather, but Zamarron was able to

---

[11]Zamarron apparently requested a subpoena for this civil case as well as a subpoena in connection with his criminal investigation. It is unclear from the record how the information requested under each differed.

see the content of those messages in the data extracted from Grandfather's phone. Nothing in those deleted messages indicated a potential suspect to Zamarron. Zamarron did not seem concerned, however, by the fact that Father's phone also had missing data. The data extraction performed on Father's phone showed that it had no cookies[12] stored on it for the four-month period between December 2020 and March 2021, that is, from around the time that Mother moved into his new house with him to the time that the investigation began. The phone extraction performed had no way of showing what those deleted items were. When asked, Zamarron said that he had no opinion on or thoughts about why there were no cookies for that period. Asked if it caused him concern, he replied, "I don't know how technology works, so I wouldn't know."

Zamarron told the jury that when he interviewed Mother, she said that she had not noticed any injuries on Carlo. Reynolds, however, testified that Mother said that she thought that she had noticed swelling on his head; Dr. Watts testified that Mother did not ask her to check Carlo's head for swelling.

Mizer testified that the Department ultimately ruled out physical abuse by Father and found "reason to believe" as to Mother. Mizer stated that some of the reasons that the Department had concluded that Mother was responsible were the

---

[12]Because the data extraction could not show what those missing cookies were, there was no way to know the sites with which any missing cookies would have been affiliated.

fact that she was the primary caregiver, the timing of Carlo's symptoms, and the fact that Mother did not show enough emotion during the investigation. Additionally, Mizer believed that Mother was more focused on asserting Father's responsibility for the injuries rather than on Carlo's injuries.

## IV. Caseworker Testimony, Personal Acquaintance Testimony, and Mother's Emails

Jada Green, a permanency specialist with Our Community Our Kids (OCOK),[13] testified about what she had observed during the case proceedings. Green testified that Father was open to correction and that his parenting skills had improved through the course of the case but that Mother was defensive and that her parenting skills had not improved. As an example of Mother's defensiveness, Green told the jury about Mother's reaction to the visitation records that Green had completed after each visit, documenting her observations. The form has a space for the parent to provide feedback, and Mother frequently used that space to disagree with Green's assessment. Green stated that Mother's and Green's description of the visits were so different as to "come across as two different visits." Green stated that in one visit, Mother allowed Carlo to play with a plastic food storage bag. After he put it in his mouth twice, Green went into the room and told Mother to remove the bag because it was a choking hazard. Mother, on the other hand, testified that she had already

---

[13]OCOK is a private entity that contracts with the Department to provide permanency and conservatorship services to parents and children.

taken the bag from Carlo and had put it away before Green came in the room. Green also testified that during multiple visits, Mother let Carlo play with a long necklace that she had worn that day despite being told that the necklace was a choking hazard. She acknowledged that Mother never left Carlo alone with the necklace.

Green also stated that before he became more mobile, Carlo cried frequently and intensely during Mother's visits, and Mother did not seem to know how to comfort him. However, Green did not offer Mother corrections or suggestions during the visits because at some point Mother's attorney had asked Green to speak to Mother only through her attorney, who was not present at the visits.

Becky Bollinger, Carlo's guardian ad litem, testified that she has seen no safety concerns during either parent's visits, but she noted that Carlo had cried a lot during the visits from early summer to December 2021 and that Mother did not have the ability to soothe him. In Bollinger's opinion, Carlo was afraid of Mother. Bollinger also stated that in her conversations with Mother, Mother mostly talked about herself.

Carlo's attorney ad litem Clayton Bryant introduced over twenty emails that Mother had sent to him on the first several days of trial. The main theme of the emails was Mother's opinions about Father, Bryant, the Department, and their case. The emails accused law-enforcement officers of negligence in their investigations, particularly with respect to the cameras that had not been immediately seized from Father's house; said that the Texas Rangers were investigating that negligence; accused Bryant of colluding together with the Department against her; claimed that the trial

was not going well for the Department, Father, and the ad litem and taunted him that their case was falling apart; stated that Father was being investigated in New Jersey for practicing medicine without a license; called Bryant a bully and declared that she would set up a fund for other parents that he bullied; said that he, Father, and the Department could not "rehab" the lies of Zamarron, Mizer, and Reynolds; and asserted that "God's TRUTH will prevail."

In addition to the testimony of the caseworkers and the guardian ad litem, Mother and Father both had personal acquaintances testify. Father's witnesses testified that they had never known him to be violent or abusive, and Mother's witnesses said the same thing about her. Louellen Wills-Agbedo, a coworker of Mother's until 2020, testified that before Carlo's injury, Mother had confided in her that Father was at times verbally and emotionally abusive. Krissy testified that in her opinion, Father was responsible for Carlo's injuries.

Mother also presented testimony from Rev. Kristin Burrow, a chaplain at the hospital where Carlo was treated. Burrow, who is a trained victim's advocate, visited Mother after receiving a referral that Mother was tearful and having trouble sleeping. Burrow testified that when she met with Mother, Mother struck her as someone who was "deeply traumatized" and was trying to make sense of what happened. Burrow further testified that nothing in Mother's reactions seemed odd or strange and nothing caused her to be concerned that Mother could have injured Carlo.

## Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear-and-convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545. Both legal and factual sufficiency turn on the clear-and-convincing standard; the distinction between the two "lies in the extent to which disputed evidence contrary to a finding may be considered" in answering the question. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In our legal sufficiency analysis, we "look at all the evidence in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *A.C.*, 560 S.W.3d at 630–31. Factual sufficiency review, on the other hand, "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was

35

true." *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review."). If we determine that no reasonable factfinder could form a firm belief or conviction that the party seeking termination proved the specific grounds for termination or that the termination of the parent–child relationship would be in the child's best interest, then the evidence is legally insufficient, and we must generally render judgment for the parent. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see* Tex. R. App. P. 43.3.

## Discussion

### I. Termination Grounds

Mother's first issue challenges the legal and factual sufficiency of the evidence to support the findings on the termination grounds and the best-interest finding.

#### A. Subsection (O) Sufficiency

Subsection (O) authorizes termination when a parent has "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the [Department's] permanent or temporary managing conservatorship." Tex. Fam. Code Ann. § 161.001(b)(1)(O). There is no evidence that Mother failed to comply with any court order. Green and Green's permanency supervisor both testified that Mother did everything that she had been asked to do during the case. Consequently, the evidence

is legally insufficient to support termination on this ground. We sustain this part of Mother's first issue.

## B. Subsection (E) and Section 161.003 Sufficiency

### 1. Establishing Termination under Subsection (E) or Section 161.003

Section 161.003 authorizes a trial court to terminate a person's parental rights if the court finds, among other things, that "(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child" and "(2) the illness or deficiency, in all reasonable probability, proved by clear[-]and[-]convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child." *Id.* § 161.003(a).

Section 161.001(b)(1)(E) focuses on the parent's behavior and permits termination when the parent has engaged in conduct that endangers the child's physical or emotional well-being. *Id.* § 161.001(b)(1)(E). "Endanger" in this context means "to expose to loss or injury, to jeopardize." *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). (first citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), and then *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). The relevant inquiry under Subsection (E) is "whether evidence exists that the

37

endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *Id.*

Subsection (E) "requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct." *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *21 (Tex. App.—Fort Worth Dec. 30, 2021, pet. denied) (mem. op.) (citing *J.T.G.*, 121 S.W.3d at 125). However, the parent's conduct need not be directed at the child or actually cause the child injury; "[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone." *M.B.*, 2015 WL 4380868, at *12. Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department. *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.); *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *6 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.).

## 2. Evidence Related to Mother's Mental Health

Because Father and the Department heavily rely on evidence related to Mother's mental health to argue that the evidence established endangering conduct and the termination ground under Section 161.003, we first discuss the evidence related to her mental health. The evidence undisputedly established that Mother has several diagnosed mental health conditions. However, as we explain, insufficient evidence shows that *because of* those mental health conditions that Mother endangered Carlo or that *because of* those conditions Mother was unable to care for Carlo at the

time of trial and would continue to be unable to care for him until his eighteenth birthday.

None of the multiple mental health providers who testified at trial said that Mother's mental health conditions endangered Carlo, made her unable to provide for his needs at the time of trial, or would in all reasonable probability continue to render her unable to provide for his needs until his eighteenth birthday. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(E), 161.003. The Department, Father, and Carlo's attorney ad litem relied on the diagnosis of bipolar disorder by Dr. Rafique, a mental health professional who did not testify at trial, but (1) that diagnosis was disputed by both testifying mental health providers qualified to diagnose a mental health disorder and (2) assuming that diagnosis was nevertheless correct, no mental health professional provided any testimony about any behaviors of Mother—whether stemming from bipolar disorder or a different condition—that made her unable to meet Carlo's needs then or in the future or that endangered Carlo. Although Boles, a licensed professional counselor who is not authorized to diagnose patients, said that Mother displayed some unspecified behavior consistent with a bipolar-disorder diagnosis, Boles said nothing about Mother's behavior endangering Carlo or rendering her unable to care for him until his eighteenth birthday.

The Department in its brief points to Dr. Ghelber's testimony that Mother showed some symptoms of postpartum depression (PPD) on February 24 and that "[s]ometimes moms, they have obsessive thoughts to hurt the baby, but they do not

39

have intentions to hurt the baby." However, the context in which Dr. Ghelber made these statements was quite clear, and equally clear is that her statements do not support the implication of the Department's brief. Rather, Dr. Ghelber was explaining why she had asked Mother certain screening questions in her initial evaluation, and Dr. Ghelber said that asking new patients and new parents about obsessive thoughts was standard practice. As Dr. Ghelber explained, a patient with obsessive-compulsive disorder or PPD could have obsessive, unwanted thoughts about hurting her baby, but those thoughts do not correlate with any actual urge to hurt the baby.[14] Dr. Ghelber never testified that Mother had such obsessive thoughts or that Mother's PPD symptoms included thoughts about hurting Carlo, and Dr. Ghelber did not say that Mother had displayed any symptoms that made her a danger to him or unable to care for him. The PPD symptoms that Dr. Ghelber had observed in Mother were restlessness, fatigue, guilt, and helplessness, and Dr. Ghelber stated that those symptoms were "[v]ery common" for new mothers to experience. Thus, the Department's reliance on this testimony is misplaced.

The psychologist who performed the court-ordered psychological evaluation of Mother during the case, Dr. Mara-Lysa Anthony, testified that Mother has a strong need to be liked, which others are likely to take advantage of; that Mother did not

---

[14]The presentation of OCD can involve intrusive, unwanted thoughts that the person does not wish to act on. Am. Psychiatric Assoc., Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013), Westlaw DSM5THS2H6.

demonstrate attitudes that are considered to be a higher risk for child mistreatment; and that there was nothing concerning on her personality assessment. Dr. Anthony did not diagnose Mother with bipolar disorder because the evidence that Dr. Anthony had did not support that diagnosis. She stated that she was surprised that the Department was seeking termination based on mental health grounds because nothing in the report that she had submitted to the Department spoke to Mother's being a danger to herself, to others, or to a child. She further explained that the general public has a bias that people who have significant mental health issues would have other problems like criminal activity or would be bad parents, but that is not necessarily the case.

Dr. Anthony agreed that a person "could potentially be" dangerous if the person has bipolar disorder and does not go to therapy, does not take prescribed medications, has panic attacks, and cannot tell what triggers those panic attacks. She did not, however, testify that this hypothetical situation existed in this case or that Mother was at risk to exhibit this potential danger. Dr. Anthony stated that she believed that Mother was managing her mental health. Further, the only evidence in this case about Mother's therapy was that she did go to therapy, and she sought help and medication for her panic attacks.

Finally, as part of her service plan, Mother attended therapy with Tamu McKinney, a licensed clinical social worker. McKinney was specifically asked if a

41

parent's having a bipolar diagnosis was enough on its own to support having a child removed from the parent, and McKinney testified that it was not.[15]

The Department also relied on lay evidence about Mother's mental conditions, but that evidence was not sufficient to establish either Section 161.003 or endangering conduct from her mental health conditions. First, the Department introduced testimony from one of Mother's former coworkers in Houston, who stated that after Mother's 2017 bipolar diagnosis, Mother told her that she did not believe she needed to take her medication. However, the coworker did not testify about what medication Mother did not believe she needed to take, nor did the coworker testify that Mother did not actually take her medication or that Mother exhibited any signs of someone who needed medication but was not taking it. That same former coworker also testified that she had never known Mother to be violent or hateful toward people.

The Department Parties also repeatedly played the 2017 Facebook video and asked witnesses about it. However, Dr. Ghelber testified that she believed that Mother's delusions that were displayed in the video were caused by "a very severe form of PTSD" resulting from the sequence of trauma that she had experienced leading up to the episode and that Mother no longer had any symptoms of PTSD. No witness testified that Mother had ever had another episode like that one, that she had

---

[15]During the Department's attorney's questioning of McKinney, the attorney suggested that having a mental health diagnosis was, on its own, sufficient under the law to terminate parental rights. That is not the law. *See* Tex. Fam. Code Ann. § 161.003.

such an episode in February 2021, or that in reasonable probability she would have another one in the future. Grandfather's texts to family members around February 10, 2021, said that Mother was feeling like she had three years before, but there is no evidence that she actually reached the point she had back then. Father testified that during the time that they had Carlo in their home, he never saw Mother have an angry outburst that would lead him to believe that Carlo was at risk of harm, and when he first learned of Carlo's injuries, he believed it must have been Grandfather who was responsible.

Maggie Ray, Green's permanency supervisor at OCOK, testified that Mother "tends to cycle in and out of crisis, sometimes without a trigger that we can necessarily see" and that the cycle made her unstable and "could lead to similar circumstances that we're in now." However, there was no evidence that Mother "cycled in and out" of mental health crises between February 2018 and February 2021, there was no evidence that Mother had ever acted violently or displayed any violent tendency in any previous mental health crisis or showed an inability to care for her child, and Ray did not explain how Mother's mental health conditions made her likely to injure Carlo or be unable to care for him until his eighteenth birthday. Ray also acknowledged that she had never spoken with Mother's psychiatrist to ask her opinion about Mother's mental state around the time of Carlo's injury.

The attorney ad litem introduced the emails that Mother had sent him during trial (discussed more below), and in Father's brief he describes those emails as

revealing Mother's "psychotic nature" and showing that she was "untethered from reality,"[16] but they do not show the kind of delusion that can be seen in the Facebook video. No witness with knowledge of mental health conditions testified about what those emails showed about Mother's mental health conditions.

As for mental health conditions besides bipolar disorder with which Mother had been diagnosed—depression, panic disorder, generalized anxiety disorder, and PTSD—no trial evidence indicated that these conditions rendered Mother unable to care for Carlo, were what had led to Carlo's injuries, or otherwise endangered him. No witness testified to ever having seen her be violent, even when under a lot of stress, even during her breakdowns in 2017 and 2018, and, again, there was no evidence that she ever had the kind of break from reality that she had in 2017 that led to her hospitalization. It was undisputed at trial that she was having increased anxiety around the time of Carlo's injury, but there was no clear and convincing evidence that her having that anxiety made her more likely to be violent or unable to care for Carlo. When she feared that her anxiety was such that she needed immediate mental health care, she appropriately secured medical care for herself and put Carlo in Father's care.

---

[16]In the context of Father's brief, in which he relies heavily on Mother's diagnoses to argue endangerment, Father's use of the word "psychotic" and the phrase "untethered from reality" cannot be construed as invoking a lay meaning of those words. Rather, Father attempts to portray the emails as evidence of her mental health conditions. However, we could only guess if that is in fact the case because none of the multiple mental health experts who testified made such an assessment about Mother or the emails.

No mental health professional testified that Mother's mental health would prevent her from meeting Carlo's needs until his eighteenth birthday.

The strongest evidence presented by the Department Parties about Mother's potential issues due to her mental health conditions was some evidence that Mother did not take one of her medications during pregnancy. Mother provided contradictory statements about which of her medications she had stopped taking during pregnancy; she testified that she had stopped taking the antidepressant Celexa because Father had requested that she do so and because her doctor had authorized her to stop. Dr. Ghelber also stated that Mother said that she had stopped taking her Celexa during the pregnancy at Father's request. However, she told Mizer and Dees that it was her Seroquel that she had stopped taking during her pregnancy because of Father. Regardless of what medication she stopped taking during the pregnancy, there was no clear-and-convincing evidence that she was not taking Seroquel after Carlo's birth and around the time of his injury, and there was some evidence—her text messages to Grandfather and her medication list in the hospital records at Carlo's birth—that she was taking it then.

As for not taking Seroquel after Carlo was removed, the Department Parties also put on testimony about Green's suspicion that Mother may not have taken one of her medications at one point after Carlo's removal. Green did periodic pill counts at Mother's visits, and once Mother had more pills than Green expected her to have based on the refill date. When Green alerted Mother to the discrepancy, Mother called

her pharmacist and put the phone on speaker so Green could hear about how her prescriptions were filled, but Mother hung up the call mid-conversation. Green did not specify which medications she had reviewed, and she could not remember how many more pills were in the bottles. Green's suspicions were mere speculation and not enough to establish endangering conduct or Mother's inability to care for her child.[17]

There is evidence, discussed below, that Mother showed questionable judgment at various points while this case was pending, but the evidence did not sufficiently link that behavior to her diagnoses. No expert made that link, and neither did any party with knowledge of how Mother behaves when her mental health conditions are not adequately treated. Although we can consider the displays of questionable judgment along with other behaviors in our endangering-conduct analysis, we will not tie that behavior to her mental health diagnoses when the evidence does not authorize us to do so.

In summary, there is no evidence that Mother had another breakdown that was like the ones she had in 2017 and 2018; no clear-and-convincing evidence showed that around the time of Carlo's injuries or afterwards, Mother was suicidal or had the kind of detachment from reality that she displayed in 2017. Mother's mental health

---

[17]Further, as we note below, although there was testimony that the Seroquel helped Mother sleep, there was no testimony about how her behavior was affected when she did not take the medication.

conditions did not disappear after her 2018 hospitalization, and Mother thus presumably at least occasionally displayed behavior related to those conditions. However, the evidence did not establish how the conditions usually affected her behavior. There was no evidence, for example, of how she behaves while medicated versus unmedicated, how she usually acts while manic (or if she does experience manic episodes), or how her depression or anxiety typically manifests in her behavior. Thus, to find that Mother's mental health conditions rendered her unable to care for Carlo, the jury had to speculate, without supporting evidence, that whatever undesirable behaviors Mother demonstrated, they must have been due to her mental health conditions.

Whether from an expert or a lay witness, no clear-and-convincing evidence showed that, *due to a mental health condition*, (1) Mother had ever presented any danger to herself or anyone else since her previous hospitalizations, around the time of Carlo's February 2021 injury, or after, or (2) she was unable to care for Carlo at that time and probably would be until his eighteenth birthday. *See, e.g., In re A.B.*, 412 S.W.3d 588, 654–55 (Tex. App.—Fort Worth 2013) (stating that a bipolar diagnosis is not enough alone to show endangerment and that the party seeking termination must show actual endangering conduct), *aff'd*, 437 S.W.3d 498 (Tex. 2014). We do not hold that expert testimony is always required to establish the ground in Section 161.003 or to link a mental health diagnosis with an endangering course of conduct, but there must at a minimum be some competent evidence within the

factfinder's knowledge or understanding of how the mental health diagnosis leads to the concerning behavior.[18] *See In re A.L.M.*, 300 S.W.3d 914, 929 (Tex. App.—Texarkana 2009, no pet.).

In summary, although Mother had previously been diagnosed as having bipolar disorder, since October 2017, there is no evidence that the trial court at the time or any health care practitioner since had found her to be a danger to herself or others. The 2017 Facebook video showed no indication that Mother's behavior is violent when she is in crisis. No mental health care practitioner or person acquainted with Mother described how, if she has bipolar disorder, it affected her when not well-controlled. No mental health care practitioner or person acquainted with Mother described how her other diagnosed mental health conditions trigger behavior that make her a danger to herself or others when the conditions are not well-controlled. When Mother felt that she was going into crisis, she appropriately had the other parent care for her child, and she sought medical care. No witness testified to ever seeing Mother seem angry in a way that made the person fear that she could be violent, even when under stress. We sustain the part of Mother's first issue challenging the Section 161.003 finding, and we hold that the evidence is legally

---

[18]To be clear, we do not hold that Mother's actions were unrelated to or unaffected by her mental health conditions. However, to the extent her mental health conditions caused or were relevant to the behavior described by other witnesses, the Department and Father failed to show that link by clear-and-convincing evidence.

insufficient to establish that Mother's diagnosed mental health conditions endangered Carlo.

### 3. The Department Parties' Other Endangering-Conduct Evidence

*The Injuries*

There was no direct evidence of who caused Carlo's injuries. Mother, Father, and Grandfather all denied that they were responsible. Because there was no direct evidence, the Department Parties relied primarily on two categories of circumstantial evidence to establish the culprit: evidence about Mother's mental health conditions and evidence about when the injuries occurred. We have already rejected the sufficiency of the evidence to show that Mother's mental health conditions made her a danger to Carlo. None of the testifying mental health practitioners testified that Mother presented a danger to herself or to others. The psychological evaluation performed by Dr. Anthony did not indicate that Mother was a threat to Carlo, and Dr. Anthony testified that given the results of her evaluation, she was surprised the Department was moving to terminate on the basis of Mother's mental health conditions. No other witness testified to witnessing Mother behave violently toward Carlo or toward anyone else.

As for evidence about when Carlo's injuries occurred, as noted above, Nurse Practitioner Wright testified that the trauma to Carlo probably happened within the week before he was brought to the hospital. She stated more specifically that it probably occurred "at some point around" February 24 or 25, 2021, because that is

when Carlo displayed the signs that Wright described as consistent with Carlo's injuries—seizures, vomiting, eating less than normal, and fussiness and irritability in a baby who is not usually fussy. She explained that with a baby who cannot report problems, "[t]he only things that we're able to look at is . . . when a baby or a child is doing something that is not normal for him. . . . [T]hat is when we know that at some point around that time is when he would have been injured."

However, she also said that with a seven-week-old baby, onset of symptoms is "quite often difficult" to see because "a seven-week-old doesn't do much of anything but [lie] there and eat and is only awake for a short time, so it can be difficult to tell if something—if they're in pain or if they have increased intracranial pressure." She further testified that it is impossible to determine the specific time at which an injury to a child occurs and that, because people bleed at different rates, the injury could have been as much as a week before Carlo was seen in the ER.

To say that Carlo must have suffered trauma around February 24–25 for his symptoms to have appeared around that time required expert causation testimony. *See Guevara v. Ferrer*, 247 S.W.3d 662, 667 (Tex. 2007) (discussing the requirement of expert testimony to prove the nature of and causal connection between physical conditions and an occurrence); *Henderson v. State*, 77 S.W.3d 321, 324–25 (Tex. App.—Fort Worth 2002, no pet.) (holding that doctor's testimony about cause of child's fatal brain injury was a matter of "clinical medicine" expertise). In Texas, a registered nurse is not authorized to make a "medical diagnosis," *see* Tex. Occ. Code Ann.

50

§ 301.002 (stating that "professional nursing" and "vocational nursing" do not include acts of medical diagnosis); 22 Tex. Admin. Code § 217.11(3) (stating that a nurse shall provide nursing care by "making nursing diagnoses that serve as the basis for the strategy of care" and "developing a plan of care based on the assessment and nursing diagnosis"), and thus is not qualified to medically diagnose the causation of a patient's injuries. *See Esquivel v. El Paso Healthcare Sys., Ltd.*, 225 S.W.3d 83, 90 (Tex. App.—El Paso 2005, no pet.); *Pace v. Sadler*, 966 S.W.2d 685, 689–90 (Tex. App.—San Antonio 1998, no pet.). Wright is an advanced practice nurse, and an advanced practice nurse may provide aspects of medical care but only when properly delegated that duty, such as under a protocol or other written authorization by a supervising physician. *See* 22 Tex. Admin. Code § 221.13(d); *Simonson v. Keppard*, 225 S.W.3d 868, 873 (Tex. App.—Dallas 2007, no pet.); *Simonson*, 225 S.W.3d at 877 (O'Neill, J., dissenting). Wright did not testify about her authorization from a supervising physician to diagnose patients or her authority to determine from the patient's condition if or when an injury occurred. Without expert testimony, the jury could not link the appearance of Carlo's symptoms to the timing of the event that caused the injury. *See Guevara*, 247 S.W.3d at 667. Excluding Wright's testimony about the probable time frame for Carlo's injury, the jury was left with her testimony that the radiologist and the neurologist who saw Carlo at Cook Children's agreed[19] that Carlo's injury would have occurred sometime within the week before Carlo's presentation at the ER.[20]

---

[19]Mother did not make a hearsay objection to Wright's testimony about what

51

Wright's testimony also failed to raise a fact issue on the timing of Carlo's injury because when circumstances are consistent with multiple possibilities, and nothing shows that one is more probable than the other, no fact can be inferred from the evidence. *See Wright v. Wal-Mart Stores, Inc.*, 73 S.W.3d 552, 555 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). Based on Wright's testimony, the February 24–25 time frame for Carlo's injury is no more probable than any other time in the week before he was seen in the ER on February 25, and it is equally likely that something occurred before the two-day time period on which the Department Parties focused at trial and in the investigation. The evidence did not exclude, or even address, any event or anyone who was around Carlo prior to February 24 or to February 25—the day the parents took Carlo to the ER. Even in looking into the February 24–25 time frame, the record shows inconsistencies in the facts as to what symptoms developed, when they developed, and how they were

the radiologist and neurologist said.

[20]The causation testimony of an unqualified witness is no evidence. *Snodgrass v. Hillcrest Baptist Med. Ctr.*, No. 07-11-00401-CV, 2013 WL 5915230, at *3 (Tex. App.—Amarillo Oct. 31, 2013, pet. denied) (mem. op.) (stating that an unqualified witness's opinion on causation is not based on reasonable medical probability and is mere speculation amounting to no evidence); *see also Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1996) (stating opinion testimony on causation that is incompetent due to witness's lack of qualifications has no probative value, constituting no evidence on a no evidence challenge on appeal). However, even if we consider Wright's testimony on the question, the only definitive aspect of this part of her testimony was that the injuries would have occurred sometime within the week before Carlo was taken to the ER on February 25.

reported. For these reasons, the evidence is legally insufficient to find that Mother—

or any other specific person—caused Carlo's injuries.

Having rejected Mother's mental health conditions and the Department Parties'

allegations that Mother injured Carlo as bases to establish endangering conduct under

Subsection (E), we now consider whether other evidence supports the finding.

*The emails and other similar evidence*

As we stated above, the emails that Mother sent to the attorney ad litem during

trial do not indicate the kind of break from reality that Mother had in 2017. The

subject, tone, and wording of the emails did reflect anger and contempt toward the

attorney ad litem, Father, and the Department. Further, sending the emails displayed

questionable judgment on Mother's part, given that Mother knew her parental rights

were at stake and that her mental state was at issue in the trial. The Department

Parties also produced other evidence of Mother's questionable judgment while the

case was pending. Specifically, Grandfather had hired a private investigator during the

case, and Mother gave that investigator the address of Carlo's first foster family (prior

to Father's parents becoming the foster parents) and asked him to go to the house.[21]

At trial she acknowledged that she had also talked with the PI about "maybe driving

by [Green]'s house." *Cf. In re C.V.L.*, 591 S.W.3d 734, 752 (Tex. App.—Dallas 2019,

---

[21]Grandfather testified that the PI was asked to gather information about who might be staying at the home, although the context of his testimony suggested that he was referring to when Carlo was staying with his second foster family, Father's parents.

53

pet. denied) (holding that although evidence showed that the father's behavior was "unquestionably an exercise of poor judgment," it was not, standing alone, sufficient to show endangerment).

However, questionable judgment aside, those acts do not rise to the level of a conscious course of conduct of endangering behavior. *Cf. id.* Further, the emails do not establish the kind of mental state that would probably subject Carlo to uncertainty and instability or would otherwise endanger his physical or mental well-being, even if they show Mother behaving in a manner that some might characterize as "difficult." *Cf. In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (quoting the statement in *Boyd*, 727 S.W.2d at 533, that "endanger" as used in Section 161.001 "means more than a threat of . . . potential ill effects of a less-than-ideal family environment"). No mental health professional opined that the emails raised any concern about Mother's mental stability or a risk that Mother might endanger her child. A parent's negative or even hostile attitude toward the Department, caseworkers, and the termination proceedings does not, on its own, show endangerment, particularly when, as here, the parent has completed all services ordered in the case.

*Mother's defensiveness*

The jury also heard Mother's own testimony in which she displayed defensiveness, at times to an excessive degree. For example, Mother was asked about Grandfather's text to her brother in February 2021 stating that Mother had said that she was feeling like she had "3 years ago"—around the time of a previous

54

hospitalization. Rather than acknowledge what Grandfather had texted and address why he might have said it, Mother suggested that perhaps he could have meant to say "tears" instead of "years." She also regularly made written disagreements with Green's visit summaries, and her relationship with Green became so contentious that her attorney asked Green to communicate with Mother only through the attorney. However, as we stated above, a parent's attitude toward caseworkers and the termination proceedings is not evidence that, by itself, shows endangering conduct.

### 4. Conclusion

The Department Parties relied primarily on Carlo's injury and Mother's mental health conditions to establish endangering conduct under Subsection (E). However, the evidence was legally insufficient to support a finding that Mother injured Carlo or that her mental health conditions endangered his physical or emotional well-being. As for the other evidence that the Department Parties presented at trial to support a Subsection (E) finding—evidence about Mother's defensive or hostile interactions with caseworkers, her emails, and her use of a private investigator—none of it was evidence from which a reasonable factfinder could form a firm belief or conviction that, as a direct result of that conduct by Mother, Carlo's physical or emotional well-being was endangered. The record is therefore legally insufficient to support the finding under Subsection (E) by clear-and-convincing evidence. We sustain this part of Mother's first issue.

55

## C. Endangering Environment under Subsection (D)

Next under Mother's first issue, we must consider whether the evidence was sufficient to establish the termination ground in Section 161.001(b)(1)(D). Under that ground, a person's parental rights may be terminated if the person knowingly placed or knowingly allowed their child "to remain in conditions or surroundings [that] endangered the [child's] physical or emotional well-being." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under Subsection (D), we must examine the evidence related to the child's environment before the child's removal to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125; *see also In re M.H.*, No. 02-15-00263-CV, 2016 WL 489780, at *17 (Tex. App.—Fort Worth Feb. 5, 2016, no pet.) (mem. op.). The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125. A parent's parental rights may not be terminated under this subsection if the parent was unaware of the endangering environment. *M.H.*, 2016 WL 489780, at *17.

Because the evidence was insufficient to support a finding about who caused Carlo's injuries, the finding under this subsection cannot be based on Mother's injuring him. If the evidence supported a finding that Father or Grandfather caused Carlo's injuries, and if Mother had reason to suspect that Father or Grandfather might cause that kind of harm, then that could be evidence to support a finding under Subsection (D). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). But even if the jury had

believed that Father or Grandfather caused the injury, there is no evidence on which it could base a finding that Mother had any reason to believe that either of them would do such a thing.

Mother took Carlo to see Dr. Watts upon noticing his leg twitching. On the same day, she took him to the ER on Dr. Watts's advice. There is no evidence that she knew someone else had endangered Carlo on an earlier date and that she had delayed seeking medical treatment or had allowed that person to be around him after that endangerment.

There is no other clear-and-convincing evidence that Carlo's environment was endangering to him because of anything Mother did or did not do. There was no evidence that Mother had ever been violent. There was no evidence that Father or Grandfather or anyone else had been violent toward Mother or Carlo and that she nevertheless let that person around Carlo. *See, e.g.*, *In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *12 (Tex. App.—Fort Worth Dec. 22, 2011, pet. denied) (mem. op.) (holding that record did not establish that the mother had a pattern of being involved in abusive relationships and of exposing her children to domestic violence); *see also In re A.D.*, No. 12-17-00334-CV, 2018 WL 6191116, at *3 (Tex. App.—Tyler Nov. 28, 2018, no pet.) (mem. op.) (holding that Department failed to present any evidence that parent was aware that children were being placed in a dangerous environment or living conditions). None of the evidence about Mother's behavior

after removal can support a Subsection (D) finding, even if we believed that her conduct after removal could create an endangering environment.

Further, because the evidence was insufficient to find that Mother's mental health conditions prior to removal were such that she was a danger to Carlo, a Subsection (D) finding cannot be based on her having those mental health conditions.[22] LPC Boles testified that she thought Mother was trying to manipulate how Father felt about her parents, but that conduct, if true, is not enough to establish endangerment. In summary, the evidence was legally insufficient to show an endangering environment under Subsection (D) by clear-and-convincing evidence.

Because we have held that the evidence was insufficient to establish any of the termination grounds on which the trial court based its judgment, we do not consider the part of Mother's first issue challenging the best-interest finding. However, we do address Mother's argument under this issue regarding conservatorship. Mother asserts in one paragraph that no or insufficient evidence exists to not name her as managing or possessory conservator.[23]

---

[22]There was some evidence that prior to Carlo's presentation at the ER, Father was attempting to trigger a mental health crisis in Mother, and he left Carlo in Mother's care after telling Krissy Burke that he was afraid that Mother might harm the baby, but the Department did not seek to terminate Father's parental rights at trial under Subsection (D) or on any other basis.

[23]In the single paragraph in which Mother addresses conservatorship, she did not mention the standard of proof applicable to the issue. The standard of proof for conservatorship decisions is preponderance of the evidence. *See* Tex. Fam. Code Ann. § 105.005.

The record indicates that the Department Parties' suits were primarily focused on terminating Mother's parental rights and that Mother's focus was on preserving her parental rights and on terminating Father's. As a consequence, the record was not adequately developed as to whether Mother should have any conservatorship rights at all if her parental rights were not terminated, and although the jury found that Father should be named as sole managing conservator,[24] it did not address possessory conservatorship. *Cf. In re F.E.N.*, 579 S.W.3d 74, 77 (Tex. 2019) (stating that remand was necessary when record did not support termination and record was not adequately developed as to conservatorship). The trial court's judgment likewise terminated Mother's rights and did not separately address conservatorship as to Mother. Accordingly, we will remand the case to the trial court to determine whether, in light of this court's opinion, Mother should be named as a conservator. *See id.* at 75. (noting that "[t]he underlying proceeding and this appeal demonstrate the difficulties that may arise when issues of termination and conservatorship are joined and litigated in a single proceeding); *see generally* Tex. Fam. Code Ann. §§ 153.131, 153.191 (addressing appointment of parent as managing or possessory conservator).

---

[24]The jury was asked to decide whether Father or the Department should be the managing conservator of the child only if it answered "Yes" to the predicate termination grounds as to Mother and also found that termination of Mother's rights was in the child's best interest. The jury was asked to choose whether Mother or Father or both should be managing conservator only if it answered "No" to either the predicate grounds or to best interest as to Mother and if it also answered "No" on either the predicate grounds or to best interest as to Father.

**II. Timeliness of Trial under Section 161.003**

Mother's second issue challenges the Section 161.003 finding in the trial court's judgment. When the Department asserts this section as a basis for termination, the termination hearing cannot be held "earlier than 180 days after the date on which the suit was filed." *Id.* § 161.003(c). The termination trial was held more than 180 days after the Department filed its original petition but less than 180 days after it filed its amended petition adding Section 161.003 as a termination ground. Mother argues that because trial was held less than 180 days from the day that the Department filed a pleading with Section 161.003 as a ground, the trial court erred by terminating on the basis of this section. Although the issue is a matter of first impression for this court, we do not address it because we have reversed the judgment as to the Section 161.003 finding. *See* Tex. R. App. P. 47.1.

## Conclusion

Having sustained Mother's first issue, which is dispositive of the appeal, we reverse the trial court's judgment terminating Mother's parental rights and remand the case to the trial court for further proceedings addressing conservatorship.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: January 12, 2023